IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

SHELBY WILSON                        :
                                     :     CIVIL ACTION
        v.                           :
                                     :     NO. 19-2198
INDUSTRIAL COMMERCIAL                :
CLEANING GROUP, INC., ET AL.         :

**<u>MEMORANDUM</u>**

**SURRICK, J.**                                         **JULY 28, 2021**

Presently before the Court is Industrial Commercial Cleaning Group. Inc.'s, Kim

Jordan's, and Ed Jordan's Motion for Summary Judgment. (ECF No. 30.) For the reasons that

follow, Defendants' Motion will be denied.

**I.      BACKGROUND**

This is an employment discrimination action under Title VII of the Civil Rights Act of

1964 ("Title VII"), 42 U.S.C. § 2000e *et seq*., the Americans with Disabilities Act ("ADA"), 42

U.S.C. § 12101, *et seq*., and the Pennsylvania Human Relations Act ("PHRA"), 42 Pa. Stat. §

951, *et seq*. Plaintiff Shelby Wilson brought multiple claims against Defendant Industrial

Commercial Cleaning Group. Inc. ("ICCG") related to her termination. Plaintiff contends that

she was terminated due to harassment and discrimination on the basis of her sex and disability.

Plaintiff alleges that Defendants retaliated against her after she complained of the harassment

and discrimination and for seeking accommodations for her disability. In addition, Plaintiff

claims Kim Jordan and Ed Jordan aided and abetted ICCG's harassment, discrimination, and

retaliation in violation of the PHRA. After a review of the summary judgment record, we are

satisfied that issues of material fact exist and must be resolved by a jury at trial.

### A.      Facts

Defendant ICCG is a New Jersey corporation that provides full-service facility support maintenance.  (ICCG's Employee Policy Manual, Defs.' Mot., Ex. A.)  Defendant Kim Jordan is the President and CEO of ICCG.  (*Id*.)  Defendant Ed Jordan is identified as a "consultant" to ICCG who supervises the SEPTA Trash & Debris Cleaning Laborers.  (E. Jordan Affidavit, Defs.' Mot., Ex. D.)

#### 1.      *Plaintiff's Hiring*

In July 2017, ICCG was hired to complete a special cleaning project at the College of New Jersey ("College of New Jersey Project").  (*Id*.)  In order to complete the project on time, Ed Jordan authorized Janitorial Supervisor Butch Lewis to hire eight additional cleaners.  (*Id*.)  Around the same time, Plaintiff asked Mr. Lewis for a job.  (Wilson Dep. 31, Pl.'s Opp'n., Ex. A.)  Mr. Lewis offered Plaintiff to work at the College of New Jersey Project and she accepted.  (Wilson Dep. 31.)  She worked at the College of New Jersey Project for two days.  (*Id*. at 32.)  Plaintiff then met with Ed Jordan at ICCG's main office to apply for a permanent position.  (*Id*. at 3.)  Ed Jordan hired Plaintiff as a laborer and assigned her to the SEPTA Trash & Debris Cleaning crew.  (E. Jordan Affidavit.)  Plaintiff testified that neither ICCG nor Ed Jordan identified her direct supervisor, job responsibilities, or working conditions.  (Wilson Dep. 34.)

Plaintiff's job title was Trash and Debris Removal.  (*Id*. at 34.)  According to Plaintiff, Mr. Lewis was her "district manager" and Kevin Nicholson was her "supervisor."  (*Id*. at 55.)  Although Mr. Nicholson's title was "crew chief," Plaintiff and other members of her crew referred to him as "supervisor."  (K. Jordan Dep. 38, Pl.'s Opp'n., Ex B)  Plaintiff's work schedule was Monday through Friday from 7:30 a.m. until 4:00 p.m.  (Wilson Dep. 35.)

2. *Plaintiff's Disability*

Plaintiff testified that she suffers from bronchitis. (*Id.* at 43.) Plaintiff asserts that her condition "causes her to suffer severe respiratory issues when exposed to high levels of pollen and mold, and/or while working in certain outdoor conditions such as woods and brush." (Am. Compl., ECF No. 12.) Plaintiff testified that she asked Mr. Lewis, Mr. Nicholson, Kim Jordan, Ed Jordan for protective equipment, such as coveralls, a mask, or a jacket. (Wilson Dep. 48.) When Plaintiff asked Mr. Nicholson about the equipment, he told her that he was "working on it." (*Id.*) When Plaintiff asked Mr. Lewis about the equipment, he told her that it had to be approved by Kim Jordan and Ed Jordan because they would have to pay for it. (*Id.*) When Plaintiff requested protective equipment from Ed Jordan, he told her that she was causing trouble at the company because no one had ever asked for accommodations. (*Id.* at 58.) Plaintiff testified that despite her requests for protective equipment, she was forced to work in the rain and cold weather. (*Id.* at 44.) Plaintiff suffered a chest infection that required her to be hospitalized for several days. (Neumann University Hospital Records Pl.'s Opp'n., Ex. C.)

In September 2017, Plaintiff's physician diagnosed her with acute bronchitis. (*Id.*) In January 2018, Plaintiff was hospitalized again, and she provided medical documentation to Mr. Lewis and Mr. Nicholson. (Wilson Dep. 46.) Plaintiff admits that she did not inform Kim Jordan about her condition, however, she did inform Ed Jordan directly. (*Id.*)

On January 12, 2018, Plaintiff was working outside when it began to rain. (P_000121, Pl.'s Opp'n., Ex. D.) Plaintiff requested to leave because she was afraid that her medical condition would cause her to contract another respiratory infection. (*Id.*) According to Plaintiff, Mr. Nicholson agreed that she could leave. (*Id.*) A few days later, Mr. Nicholson reported Plaintiff for "job abandonment," claiming that she walked off the job. (P_000126, Defs.' Mot.,

Ex. P.)  As a result, Ed Jordan suspended Plaintiff for one week and he authorized Mr. Nicholson to enforce the suspension. (E. Jordan Affidavit.)

       3.    *Hostile Work Environment*

Mr. Nicholson harassed Plaintiff with sexual questions and comments.  Plaintiff alleged that Mr. Nicholson asked her questions such as:

> "Do you shave your p*ssy?"
> "Do you like to be licked?"
> "How do you and your girlfriend have sex?"
> "What positions do you and your girlfriend use?"
> "Do you and your girlfriend use toys?"
> "Did you ever mess with men before?"
> "Do you like big d*cks?"
> "Can you take a d*ck?"
> "How do you like your p*ssy ate?"

(Wilson Dep. 65.)  According to Plaintiff, she endured this harassment daily.  (*Id*.)  It occurred at their work site or inside their work truck.  (*Id*.)  Plaintiff testified that Mr. Nicholson told her that she was "sexy" every time she smiled.  (*Id*. at 67.)  Plaintiff asked Mr. Nicholson not to say things like that to her.  (*Id*. at 68.)  Plaintiff claims that other employees overheard Mr. Nicholson's comments.  (*Id*.)

Plaintiff reported Mr. Nicholson's conduct to Mr. Lewis.  (*Id*. at 78.)  Mr. Lewis told Mr. Nicholson to stop.  (*Id*. at 81.)  Eventually, Mr. Lewis told Plaintiff that she needed to report Mr. Nicholson's behavior to Kim Jordan, President and CEO of ICCG.  (*Id*. at 78.)  Plaintiff wrote a letter to Kim Jordan.  (*Id*. at 122.)  The two attempted to meet, but no meeting occurred.  (*Id*. at 78.)  Plaintiff called Kim Jordan's cellular phone several times and left her voicemails.  (*Id*. at 87.)  Plaintiff also called Ed Jordan on his personal cell phone to tell him about the way Mr. Nicholson had been treating her.  (*Id*.)  According to Plaintiff, no matter how much she complained, nothing changed, and Mr. Nicholson's vulgar comments continued.  (*Id*. at 70.)

Plaintiff never received a copy of ICCG's sexual harassment policy or protocol and requested one on several occasions.  (P000089, Pl.'s Opp'n., Ex. F.)  The sexual harassment policy that was in place at the time stated that the individual was to contact her supervisor.  (K. Jordan Dep. 30.)  The sexual harassment policy did not go into detail regarding what to do if an employee felt that they were being sexually harassed.  (*Id*.)  Mr. Nicholson and Mr. Lewis did not receive formal training in discrimination and harassment.  (*Id*. at 42.)

In October 2017, Mr. Nicholson showed up around Plaintiff's home.  (Wilson Dep. 74.) Mr. Nicholson asked her to come outside to "chill" with him, stating he wanted her to be his "pretty young thing."  (*Id*.)  Plaintiff rejected Mr. Nicholson's advance.  (*Id*.)  She testified that everything changed after that.  (*Id*.)  One employee testified that "[she] had it real good and then it just turned real bad out of nowhere. So I don't -- I don't know whatever happened. Something happened after work or something like that. I don't know, but it went real good to real bad."  (Ed Floyd Interview, Pl.'s Opp'n., Ex. N.)  Plaintiff testified that she enjoyed working at ICCG until Mr. Nicholson made it uncomfortable.  (Wilson Dep. 42.)

        4.  *January 19 Meeting*

On January 19, 2018, Plaintiff, Kim Jordan, Ed Jordan, Mr. Lewis, and Mr. Nicholson met.  (*Id*. at 90.)  At that meeting, Plaintiff informed Kim Jordan and Ed Jordan that Mr. Nicholson had been sexually harassing her at work.  (*Id*.)  Based on Plaintiff's accusations, Kim Jordan determined that ICCG would have to investigate.  (Audio Recording, Defs.' Mot., Ex. G.) Kim Jordan and Ed Jordan assigned Plaintiff to a different work crew while ICCG conducted its investigation.  (*Id*.)  ICCG claims it was unable to substantiate Plaintiff's allegations against Mr. Nicholson.  (K. Jordan Dep. 23.)

5.    *Plaintiff's Employment After January 19 Meeting*

Since their meeting, Plaintiff received several write-ups.  ICCG denied Plaintiff opportunities to work overtime.  (Wilson Dep. 41.)  Mr. Nicholson reported several acts of insubordination to Kim Jordan.  (K. Jordan Dep. 89.)  As a result, Kim Jordan believed Plaintiff was generally insubordinate.  (*Id*.)

In April 2018, ICCG claims that Plaintiff's performance appeared to be intentionally egregious.  On April 23, 2018, Plaintiff's new supervisor, Robert Mills, issued Plaintiff a warning for driving her personal vehicle while on duty and onto SEPTA locations. (Employee Disciplinary Action Notice, Defs.' Mot., Ex. J.)

Kim Jordan began to believe that Plaintiff's conduct was impacting the overall service ICCG provided.  (Robert Mills Interview, Defs.' Mot., Ex. P.)  On May 14, 2018, Kim Jordan decided to transfer Plaintiff back to her original position with the SEPTA Trash and Debris Cleaning crew. (May 9, 2018 Ltr., Defs.' Mot., Ex. Q.)  Around that same time, Kim Jordan decided to look further into Plaintiff's claims of sexual harassment. (K. Jordan Dep. 45.)  On May 10, 2018, Defendant ICCG terminated Mr. Nicholson's employment.  (Nicholson Termination Ltr., Defs.' Mot., Ex. S.)

On July 27, 2018, a SEPTA Project Management Analyst requested that Ed Jordan remove Plaintiff from its contract because Plaintiff refused to work under normal working conditions.  (Eric Newby's Message, Defs.' Mot., Ex. V.)  Kim Jordan removed Plaintiff from the SEPTA Trash and Debris Cleaning crew because the request came from one of ICCG's clients.  (July 27, 2018 Ltr., Defs.' Mot., Ex. W.)  Kim Jordan offered Plaintiff the only other supervised janitorial positions available.  (K. Jordan Dep. 22-23.)  The first option was located at the Elizabeth Train Station, in Elizabeth, New Jersey from 8:00 a.m. to 2:00 p.m.; the second

option was located at the Rail Operations Center in Kearny, New Jersey from 7:00 a.m. to 3:00 p.m. on Saturdays and Sundays.  (July 27, 2018 Ltr.)  Plaintiff chose not to accept either position.  (Wilson Dep. 179.)  Plaintiff testified that she could not take either position because of the long commute and the weekend hours.  (*Id*.)  Plaintiff's employment with ICCG ended on August 3, 2018.  (K. Jordan Dep. 12.)

      **B.**     **Procedural History**

      Plaintiff filed a complaint with the Equal Employment Opportunity Commission ("EEOC") for sex discrimination on May 30, 2018.  (Charge of Discrimination, Pl.'s Opp'n., Ex. P.)  Plaintiff amended her EEOC complaint on August 7, 2018.  (Amended Charge of Discrimination, Pl.'s Opp'n., Ex. Q.)  The EEOC issued Plaintiff her Right to Sue Letter and she filed her first Complaint in this Court on May 21, 2019.  (ECF No. 1.)  On August 16, 2019, Plaintiff filed an Amended Complaint.  (ECF No. 12.)  The Amended Complaint contains three counts: (1) discrimination, harassment, and retaliation under Title VII, asserted against ICCG (Count I) ; (2) discrimination, harassment, retaliation, failure to accommodate, and failure to engage in the interactive process under the ADA, asserted against ICCG (Count 2); and (3) discrimination, harassment, retaliation, failure to accommodate, and failure to engage in the interactive process under the PHRA, asserted against ICCG, Kim Jordan, and Ed Jordan (Count 3).  (*Id*.)  On September 16, 2019, Defendants filed an Answer to Plaintiff's Amended Complaint.  (Answer, ECF No. 15.)  Defendants jointly filed the present Motion for Summary Judgment on January 11, 2021.  (Defs.' Mot., ECF No. 30.)  On February 11, 2021, Plaintiff filed a response to Defendants' Motion.  (Pl.'s Opp'n., ECF No. 32.)  Defendants filed a reply on February 25, 2021.  (Defs.' Reply, ECF No. 34.)

### III.    LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  When making this determination, we must weigh all facts in the light most favorable to the non-moving party and draw all reasonable inferences in favor of the non-moving party.  *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 288 (3d Cir. 2018) (citation omitted).  "For its part, '[t]he non-moving party must oppose the motion and, in doing so, may not rest upon the mere allegations or denials of his pleadings' but, instead, 'must set forth specific facts showing that there is a genuine issue for trial.  Bare assertions, conclusory allegations, or suspicions will not suffice.'"  *Id*. at 288-89 (quoting *D.E. v. Central Dauphin Sch. Dist.*, 765 F.3d 260, 268-69 (3d Cir. 2014)).

"A factual dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Id*. at 289 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "Conversely, 'where a non-moving party fails sufficiently to establish the existence of an essential element of its case on which it bears the burden of proof at trial, there is not a genuine dispute with respect to a material fact and thus the moving party is entitled to judgment as a matter of law.'"  *Goldenstein v. Repossessors Inc.*, 815 F.3d 142, 146 (3d Cir. 2016) (quoting *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 265 (3d Cir. 2014)).

IV.     **DISCUSSION**

A.      **Title VII Claim (Count I)[1]**

ICCG argues that the record evidence in this case does not support a Title VII hostile

work environment claim.  ICCG concedes that disputes of fact exist as to whether Mr. Nicholson

sexually harassed Plaintiff and whether that harassment was pervasive and regular.  Therefore,

ICCG does not address those elements in its Motion.  ICCG asserts that summary judgment must

be entered in its favor because Mr. Nicholson's harassment did not "detrimentally affect"

Plaintiff and Plaintiff cannot establish *respondeat superior* liability.  Plaintiff has raised a

genuine issue of material fact as to those elements.

1.      *Hostile Work Environment*

To establish a prima facie case for hostile work environment, Plaintiff must establish (1)

that she suffered intentional discrimination because of her sex; (2) the discrimination was severe

and pervasive; (3) the discrimination detrimentally affected her; (4) the discrimination would

detrimentally affect a reasonable person in similar circumstances; and (5) the existence of

*respondeat superior*.  *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013).

"To determine whether an environment is hostile, a court must consider the totality of the

circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is

---

[1] For our purposes, "[t]he proper analysis under Title VII and the [PHRA] is identical, as Pennsylvania courts have construed the protections of the two acts interchangeably." *Weston v. Pennsylvania*, 251 F.3d 420, 426 n.3 (3d Cir. 2001), overruled in part on other grounds by *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006); *see also Dici v. Com. of Pa.*, 91 F.3d 542, 552 (3d Cir. 1996) ("Generally, the PHRA is applied in accordance with Title VII."); *Davis v. Sheraton Soc'y Hill Hotel*, 907 F. Supp. 896, 899 n.1 (E.D. Pa. 1995) ("The PHRA is applied to accord with Title VII. For this reason, our discussion under Title VII applies equally to the PHRA claim."); *Driscoll v. Lincoln Tech. Inst.*, 702 F. Supp. 2d 542, 545-46 (E.D. Pa. 2010) (analyzing Title VII and the PHRA under the same standard and noting that the "PHRA uses nearly identical language" to Title VII).  Therefore, we analyze Plaintiff's PHRA claim under the Title VII standard.

physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Id*. at 168 (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)).

However, "[o]ffhand comments[ ] and isolated incidents (unless extremely serious) will not amount to discriminatory changes 'in the terms and conditions of employment.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998); *see also Drinkwater v. Union Carbide Corp.*, 904 F.2d 853, 863 (3d Cir.1990) ("Hostile environment harassment claims must demonstrate a continuous period of harassment, and two comments do not create an atmosphere."). "Title VII ... does not set forth a general civility code for the American workplace," *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006) (internal quotations omitted). The statute does not protect against all workplace difficulties, including crass and unwarranted behavior, *Saidu–Kamara v. Parkway Corp.*, 155 F. Supp. 2d 436, 439 (E.D. Pa. 2001).

### a.    Detrimentally Affected

Plaintiff's testimony provides a basis from which a reasonable fact finder could infer that Mr. Nicholson's conduct detrimentally affected her and would have impacted a reasonable person subjected to similar circumstances. *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 68 (1986) ("The correct inquiry is whether [the plaintiff] by her conduct indicated that the alleged sexual advances were unwelcome. . . ."); *see also Harris*, 510 U.S. at 21-22 ("[I]f the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.) A plaintiff need not establish a "tangible psychological injury," but she must, at the very least, "subjectively perceive the environment to be abusive." *See Harris*, 510 U.S. at 23.

The record evidence shows that Plaintiff routinely made her subjective feelings towards Mr. Nicholson's conduct clear, and she told him to stop.  She testified that she did not want him speaking to her like that and Mr. Nicholson told her that it "wasn't that bad."  Plaintiff also made several attempts to report Mr. Nicholson's behavior and searched for avenues to do so.  We are satisfied that Plaintiff's testimony demonstrates that Mr. Nicholson's sexual comments were unwelcome, her work environment, whether it was at their job site or in their work truck, was abusive, and detrimentally affected her.  Moreover, other employees, who were not targets of Mr. Nicholson's comments, felt the need to approach him about his conduct, as well.  Any reasonable person would find such an environment to be hostile and abusive, as Mr. Nicholson's alleged behavior included repeated crude statements and questions.

> b.   Respondeat Superior

The basis of an employer's liability for a hostile work environment claim depends on whether the harasser is the victim's supervisor or coworker.  *Huston v. Procter & Gamble Paper Prods. Corp.*, 568 F.3d 100, 104 (3d Cir. 2009).  "'When the hostile work environment is created by . . . . non-supervisory coworkers,' employers are 'not automatically liable' in all instances." *In re Tribune Media Co.*, 902 F.3d 384, 400 (3d Cir. 2018) (quoting *Huston*, 568 F.3d at 104). "'Rather, employer liability ... exists only if [ (1) ] the employer failed to provide a reasonable avenue for complaint or ... [ (2) ] the employer knew or should have known of the harassment and failed to take prompt and appropriate remedial action.'"  *Id*. (quoting *Huston*, 568 F.3d at 104).  For an avenue for complaint to be reasonable, it must be "effective."  *See Rorrer*, 712 F. Supp. 2d at 430 (citing *Bouton v. BMW of North Am. Inc.*, 29 F.3d 103, 110 (3d Cir. 1994)).

The record demonstrates *respondeat superior* liability.  When a harassing employee does not supervise the victim, the plaintiff must show that "the employer knew or should have known

of the harassment and failed to take prompt and appropriate remedial action." *Kunin v. Sears Roebuck & Co.*, 175 F.3d 289, 293-94 (3d Cir. 1999) (quoting *Huston*).  Plaintiff testified that she reported and attempted to report Mr. Nicholson's harassment on several occasions.  She also testified that Mr. Lewis reported her complaints to Ed Jordan, as well.  Plaintiff testified that she had not received any information on how to lodge a formal complaint within ICCG.  This is sufficient to demonstrate that ICCG had notice of the harassment or that they failed to provide a reasonable avenue for Plaintiff to make her complaint.  A jury could reasonably conclude that ICCG failed to take appropriate remedial action or provide an effective avenue for Plaintiff to make her complaint.

Accordingly, Plaintiff's hostile work environment claim may proceed to trial.

2.     *Title VII Retaliation Claim*

Title VII prohibits an employer from discriminating against an employee "because [s]he has opposed any. . . . unlawful employment practice" under Title VII, or because she has "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" pursuant to Title VII.  42 U.S.C. § 2000e-3(a); *see also Moore v. City of Philadelphia*, 461 F.3d 331, 340-41 (3d Cir. 2006).  To make out a prima facie case of retaliation, Plaintiff must prove (1) that she engaged in a protected activity; (2) that she suffered an adverse employment action; and (3) a causal connection between the protected activity and the employment action.  *Moore*, 461 F.3d at 340-41.  "A general complaint of unfair treatment is insufficient to establish protected activity under Title VII."  *Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*, 450 F.3d 130, 135 (3d Cir. 2006).  But grievances, formal or informal, relating to discriminatory conduct prohibited by Title VII are protected.  *Sung Tran v. Delavau LLC*, 615 F. Supp. 2d 381, 386 (E.D. Pa. 2009).

ICCG does not contest that Plaintiff suffered an adverse employment action when she was removed from the SEPTA Trash & Debris Crew.  ICCG argues that Plaintiff cannot establish that the decision maker had any knowledge of Plaintiff's participation in a protected activity, and, therefore, cannot establish a causal connection between the protected activity and the adverse employment action.  Alternatively, ICCG asserts that even if Plaintiff could establish a causal connection, she cannot show pretext because Plaintiff chose to end her employment with ICCG.

The record sufficiently supports a Title VII retaliation claim.  Plaintiff asserts that following her complaints about Mr. Nicholson she received suspensions, write-ups, and denied opportunities to work overtime.  Following Plaintiff's ultimate rejection of Mr. Nicholson, he complained about Plaintiff's work habits, reported her for insubordination, and leaving work early to Kim Jordan and Ed Jordan.  Kim Jordan believed that Plaintiff was generally insubordinate.  Moreover, another employee testified that he noticed a change in Plaintiff's treatment at work.  When looking at the facts in a light most favorable to Plaintiff, a jury could draw several reasonable inferences from the timing of Plaintiff's rejection of Mr. Nicholson's advance, her on-going complaints about him to others, and the adverse action taken against her.  As such, Plaintiff has made out a prima facie case of Title VII retaliation.

**B.      ADA Claim (Count II)[2]**

Under the ADA, employers are prohibited from discriminating against "a qualified individual on the basis of a disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  A plaintiff who proceeds using the burden-shifting framework set forth in *McDonnell Douglas* must first establish a *prima facie* case of discrimination.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Walton v. Mental Health Ass'n of Southeastern Pa.*, 168 F.3d 661, 667-68 (3d Cir. 1999) ("The *McDonnell Douglas* Title VII burden shifting rules apply to claims of discriminatory treatment under the ADA.").  Once a plaintiff states a *prima facie* case, the defendant has the "relatively light" burden of articulating any legitimate non-discriminatory reason for the adverse employment decision.  *McDonnell Douglas*, 411 U.S. at 792.  If the defendant provides this reason, then the burden shifts back to the plaintiff to show that the reason the defendant articulated was merely a pretext for discrimination.

1.      *Prima facie case of discrimination*

To establish a *prima facie* case of discrimination under the ADA, Plaintiff must demonstrate that she is (1) disabled within the meaning of the ADA, (2) she can perform the essential functions of her job with or without reasonable accommodation, and (3) she suffered an adverse employment action as a result of discrimination based on her disability.  *Feliciano v.*

---

[2] Although the ADA, as amended, and the PHRA define "disability" differently, all other elements of the claims under each statute are analyzed in the same manner.  *Blassingame v. Sovereign Sec., LLC*, No. 17-1351, 2017 WL 3390199, at *8, 2017 U.S. Dist. LEXIS 123980, at *23 n.5 (E.D. Pa. Aug. 7, 2017) ("[W]hile the disability standards are different, the remaining elements of an ADA and PHRA claim are essentially the same and can be analyzed together." (citing *Rubano v. Farrell Area Sch. Dist.*, 991 F. Supp. 2d 678, 689 n.7 (W.D. Pa. 2014)).

*Coca-Cola Refreshments USA, Inc.*, 281 F. Supp. 3d 585, 592 (E.D. Pa. 2017) (citing *Shaner v. Synthes*, 204 F.3d 494, 500 (3d Cir. 2000).

a.   <u>Disability</u>

The ADA defines a disability as: (a) a physical or mental impairment that substantially limits one or more major life activities of [an] individual; (b) a record of such an impairment; or (c) being regarded as having such an impairment.  42 U.S.C. §12102(1).

ICCG argues that Plaintiff does not suffer from a disability as defined by the ADA. ICCG concedes that bronchitis is a physical impairment that affects a major life activity, namely breathing.  However, ICCG asserts that Plaintiff does not suffer from a substantially limiting condition as defined by the ADA Amendments Act ("ADAAA").  *See* 42 U.S.C. § 12102.

In 2008, Congress passed the ADAAA, expressly rejecting the standard of strict interpretation of the words "substantially" and "major" for qualifying as disabled.  *Thomas v. Bala Nursing & Retr. Ctr.*, No. 11-5771, 2012 WL 2581057, at *6 (E.D. Pa. July 3, 2012).  The ADA Regulations provide that "[a]n impairment is a disability within the meaning of this section if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population." 29 C.F.R. § 1630.2(j)(l)(ii).  "Substantially limits" should be construed broadly and should not demand extensive analysis.  *Id*. § 1630.2(j)(1).  In addition, "[a]n impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active."  *Id.* § 1630.2(j)(1)(vii).  "An impairment that substantially limits one major life activity need not substantially limit other major life activities in order to be considered a substantially limiting impairment."  *Id.* § 1630.2(j)(1)(viii).

ICCG concedes that bronchitis affects Plaintiff's breathing, and that breathing is a major life activity.  ICCG asserts that Plaintiff's disability does not substantially limit her breathing

because it is a short-term, non-chronic impairment.  There is nothing in the ADA that delineates

chronic from non-chronic impairments.  *See* 29 C.F.R. § 1630.2(j)(1)(ix) (noting that "[t]he

effects of an impairment lasting or expected to last fewer than six months can be substantially

limiting within the meaning of this section.").

Here, there is enough evidence to support a finding that Plaintiff suffers from a disability

under the ADA.  Plaintiff testified that she suffers from bronchitis.  She testified that certain

working conditions, such as the rain or cold weather and dense areas of pollen and mold, may

cause her bronchitis to flare up.  While working for ICCG, Plaintiff was treated for a chest

infection and was hospitalized on more than one occasion.  Therefore, pursuant to "the stated

intent of the ADAAA" and "the statute's command to construe 'disability' broadly," we are

satisfied that Plaintiff has established a genuine dispute of material fact as to whether she is

disabled under the ADA.[3]  *See Butler v. BTC Foods, Inc.*, No. 12-0492, 2014 WL 336649, at *4

(E.D. Pa. Jan. 30, 2014) (quoting *Estate of Murray v. UHS of Fairmount, Inc.*, No. 10-2561,

2011 WL 5449364, at *8 (E.D. Pa. Nov. 10, 2011)).

b.  Qualified Individual

Next, Plaintiff must establish that she was an individual qualified to perform the essential

functions of her job with or without accommodation.  The term "qualified individual with a

disability" is defined by the ADA as "an individual with a disability who, with or without

reasonable accommodation, can perform the essential functions of the employment positions that

---

[3] Before the passage of the ADA Amendments Act of 2008, courts generally considered
the ADA and PHRA coextensively.  *See Gardner v. SEPTA*, 410 F. Supp. 3d 723, 734 n.5 (E.D.
Pa. 2019).  However, because the ADAAA relaxed the definition of disability, whereas there has
been no similar change to the PHRA, some courts have since considered ADA and PHRA claims
separately.  *See, e.g., Rubano v. Farrell Area Sch. Dist.*, 991 F. Supp. 2d 678, 689 n.7 (W.D. Pa.
2014).  Here, Defendants do not separate their analysis of Plaintiff's disability, however, our
conclusion would be the same under the PHRA.

such individual holds or desires."  42 U.S.C. § 12111(8).  Section 12111(8) goes on to explain

that "consideration shall be given to the employer's judgment as to what functions of the job are

essential, and if the employer has prepared a written description before advertising or

interviewing applicants for the job, this description shall be considered evidence of the essential

functions of the job."  *Id.*  The determination of whether an individual with a disability is

"qualified" is a two-part inquiry.  29 C.F.R. § 1630.2(m) app.  The first question is whether the

individual satisfies the prerequisites for the position.  *Id.*  The second question is whether the

individual can perform the essential functions of the position, with or without a reasonable

accommodation.  *Id.*

ICCG argues that Plaintiff cannot establish that she is a qualified individual with a

disability because her bronchitis does not entitle her to a reasonable accommodation.  ICCG

asserts it was an essential function of Plaintiff's position as a SEPTA Trash & Debris Laborer

crew to work "outside in all weather conditions (heat, cold, rain, snow, etc.), on live electrified

rail lines with running trains."  According to ICCG, because Plaintiff could not work outside in

all weather conditions, as her job description specified, she could not fulfill the essential

elements of her job without an accommodation.  We disagree.

The Third Circuit has explained that the employer's judgment as to which functions are

essential and the written job description are two types of evidence courts *may* use to determine

the essential functions of a position, however, "such evidence is not to be given greater weight

simply because it is included in the non-exclusive list set out in 29 C.F.R. § 1630.2(n)(3)."

*Deane v. Pocono Med. Ctr.*, 142 F.3d 138, 148 (3d Cir. 1998) (citing 29 C.F.R. pt. 1630, app. §

1630.2(n)).[4]  Indeed, the determination of what is an essential function "is a factual

determination that must be made on a case by case basis [based upon] *all* relevant evidence," and

a job description alone is not dispositive.  *Id.*  As such, the Third Circuit has made clear that

when it comes to whether a job requirement is an essential job function is a close question of

fact, it should be left for the jury.  *Turner v. Hershey Chocolate USA*, 440 F.3d 604, 613 (3d Cir.

2006) ("[T]he fact issue as to 'essential function' must be decided by a jury.") (citation omitted).

---

[4]   (n) Essential functions—

(1) In general. The term essential functions means the fundamental job duties of the employment position the individual with a disability holds or desires. The term "essential functions" does not include the marginal functions of the position.

. . .

(3) Evidence of whether a particular function is essential includes, but is not limited to:

(i) The employer's judgment as to which functions are essential;

(ii) Written job descriptions prepared before advertising or interviewing applicants for the job;

(iii) The amount of time spent on the job performing the function;

(iv) The consequences of not requiring the incumbent to perform the function;

(v) The terms of a collective bargaining agreement;

(vi) The work experience of past incumbents in the job; and/or

(vii) The current work experience of incumbents in similar jobs.

29 C.F.R. § 1630.2(n)(1)-(3).

Here, Plaintiff has adduced sufficient evidence to create an issue of fact as to whether it was an essential function of her position as a SEPTA Trash & Debris Laborer to work outside in all conditions.  The record evidence demonstrates that she performed her duties under these conditions until doing so triggered her bronchitis.

If the jury determines that "working in all conditions" was in fact an essential part of Plaintiff's position, the second part of the inquiry is whether or not the individual can still perform that function with or without a reasonable accommodation.  29 C.F.R. § 1630.2(m) app. Construing the facts in Plaintiff's favor, a juror could conclude that Plaintiff's request for protective equipment was a reasonable accommodation.  The record evidence demonstrates that after she was hospitalized, Plaintiff may have continued to perform the essential functions of her job if Plaintiff had provided her some form of protection.

c.    <u>Adverse Employment Action</u>

The third element of a *prima facie* case is whether Plaintiff suffered an adverse employment action as a result of discrimination based on her disability.  This element requires a "causal nexus between [the] disability" and the adverse employment action.  *See Drummer v. Trustees of University of Pennsylvania*, 286 F. Supp. 3d 674, 683 (E.D. Pa. 2017); *see also Decker v. Alliant Techs., LLC*, 871 F. Supp. 2d 413, 428 (E.D. Pa. 2012) (plaintiff "must show that his perceived disability was a 'determinative factor' in [employer's] decision to terminate his terminate" (quoting *Watson v. SEPTA*, 207 F.3d 207, 214-15 (3d Cir. 2000)).  This element also requires that Plaintiff plead an "adverse employment action," which is defined as an action that "alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee."  *Decker*, 871 F. Supp. 2d at 428 (citations omitted).

The Third Circuit employs "an objective test in determining whether an employee was constructively discharged from employment: whether 'the conduct complained of would have the foreseeable result that working conditions would be so unpleasant or difficult that a reasonable person in the employee's shoes would resign.'" *Gray v. York Newspapers*, 957 F.2d 1070, 1079 (3d Cir. 1992) (quoting *Goss v. Exxon Office Systems Co.*, 747 F.2d 885, 887-88 (3d Cir. 1984)). "To make this showing, more than subjective perceptions of unfairness or harshness or a stress-filled work environment are required." *McLaughlin v. Rose Tree Media School Dist.*, 52 F. Supp. 2d 484, 493 (E.D. Pa. 1999).

ICCG concedes that Plaintiff suffered an adverse employment action when she was removed from the SEPTA Trash & Debris Crew. However, ICCG argues that Plaintiff never requested an accommodation and, even if Plaintiff did, she cannot establish a causal connection between her request and the adverse action against her. We disagree.

Here, the record evidence shows that Plaintiff requested an accommodation. Plaintiff testified that she asked Mr. Lewis and Mr. Nicholson for protective equipment, such as coveralls, a mask, or a jacket. Mr. Lewis told Plaintiff that it had to be approved my Kim Jordan and Ed Jordan because that would have to pay for it. Mr. Nicholson told Plaintiff that he was "working on it." When Plaintiff requested protective equipment from Ed Jordan, he told her that she was causing trouble at the company because no one had ever asked for accommodations. Such comments demonstrate that ICCG was aware of Plaintiff's request. Moreover, whether ICCG constructively discharged Plaintiff when it offered her two alternative positions that required her to work weekends with a two-hour commute in both directions remains a disputed question for the jury to resolve. Accordingly, Plaintiff has raised a genuine issue of material fact as to this element.

2.   *Legitimate Non-Discriminatory Reason for Adverse Employment Action and Pretext*

In all ADA discrimination cases, "[o]nce a plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action." *Stouch v. Twp. of Irvington*, 354 F. App'x 660, 666 (3d Cir. 2009) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)). "The plaintiff then bears the burden of establishing that this proffered reason is a pretext for discrimination." *Id.*; *Walton*, 168 F.3d at 667-68.  The burden shifts back to Plaintiff to show that Defendant's proffered reason is pretextual.

Here, Defendants have met their light burden.  ICCG points to the fact that the SEPTA Project Manager requested Plaintiff be removed from the Trash and Debris Cleaning contract. ICCG asserts that it its decision to follow through with their clients request amounts to a business decision with which it must comply.  ICCG offered Plaintiff the only other two supervised janitorial positions that it had available.  Because Plaintiff chose not to accept either of those positions, ICCG claims its action cannot be construed as discriminatory or otherwise.

To show pretext, Plaintiff can either (1) cast doubt on the legitimate reason Defendant proffered such that a reasonable factfinder could conclude it was contrived or (2) show that discrimination was more likely that not "a motivating or determinative cause of the adverse employment action." *Fuentes v. Perksie*, 32 F.3d 759, 764 (3d Cir. 1994).  The focus is not on whether the employer's decision was "wrong or mistaken" but rather "whether the discriminatory animus motivated the employer." *Id.* at 765.  To do this, a plaintiff "must demonstrates such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the employer's proffered reasons that a reasonable factfinder could find them incredible. *Id.*  In making this determination, a court can consider the evidence a plaintiff offers

in support of his *prima facie* case as well.  *See Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 286 (3d Cir. 2000) ("Evidence supporting the prima facie case is often helpful in the pretext stage and nothing about the *McDonnell Douglas* formula requires us to ration the evidence between one stage or the other.").

When construing the facts in Plaintiff's favor, we find that Plaintiff has adduced sufficient evidence to create a genuine issue of fact regarding pretext.  A jury and not a judge should rightfully decide disputed issues of material fact.  *See, e.g., Anderson*, 477 U.S. at 255 (stating that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge," and are thus inappropriate at the summary judgment stage) (citation and internal quotation marks omitted); *Skerski v. Time Warner Cable Co.*, 257 F.3d 273, 278 (3d Cir. 2001).  The record evidence reveals a genuine issue of fact regarding whether ICCG's proffered reason was pretextual.  Ed Jordan's statement that Plaintiff was causing trouble at ICCG because no one had ever asked for accommodations before and that it was not a problem until she started asking for them is enough for a jury to conclude that discrimination was more likely that not "a motivating or determinative cause of the adverse employment action."  It implies that Ed Jordan had knowledge of Plaintiff's requests for accommodations and a jury must decide whether the testimony is credible and how much weight it deserves.  Moreover, the positions ICCG offered Plaintiff casts doubt on its legitimate nondiscriminatory reasons.  As such, ICCG's motion on this claim will be denied.

3.     *ADA Retaliation Claim*

"To make out a retaliation claim, the employee must allege: (1) he engaged in protected employee activity; (2) he suffered an adverse employment action; and (3) the adverse action was causally related to the protected activity."  *Drummer*, 286 F. Supp. 3d at 683 (citing *Conoshenti*

*v. PSE&G Co.*, 364 F.3d 135, 146-47 (3d Cir. 2004)).  The *McDonnell Douglas* burden-shifting framework, discussed above, also applies to ADA retaliation claims.  Additionally, a plaintiff has the burden of proving retaliatory animus played a role in the employer's decision-making process and that it had a determinative effect on the employer's decision.  *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 501 (3d Cir. 1997).

For all the reasons explained, *supra*, with respect to Plaintiff's ADA discrimination claim, her retaliation claim also survives summary judgment.  Plaintiff has made out a *prima facie* case of retaliation.  Generally, "protected activities" include "'participat[ing] in any manner in an investigation, proceeding, or hearing' under the employment-discrimination statutes."  *See EEOC v. Allstate Ins. Co.*, 778 F.3d 444, 449 (3d Cir. 2015) (quoting 42 U.S.C. § 12203(a)).  However, the act of requesting an accommodation also constitutes protected activity.  *See Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 191 (3d Cir. 2003) (quoting *Soileau v. Guilford of Maine, Inc.*, 105 F.3d 12, 16 (1st Cir. 1997) ("[I]t would seem anomalous . . . to think Congress intended no retaliation protection for employees who request a reasonable accommodation unless they also file a formal charge.  This would leave employees unprotected if an employer granted the accommodation and shortly thereafter terminated the employee in retaliation.")).  There are no "magic words" required to request an accommodation, but the employer must have enough information to "make appropriate inquiries about the possible need for accommodation."  *Colwell v. Rite Aid Corp.*, 602 F.3d 495, 507 (3d Cir. 2010) ("[T]he law does not require any formal mechanism or 'magic words' to notify an employer that an employee needs an accommodation. . . .") (citations omitted).

Plaintiff was hospitalized with bronchitis twice while working for ICCG.  A jury could conclude that Plaintiff's request for protective equipment qualifies as a request for reasonable

accommodation and was a protected employee activity.  When she requested the equipment from

Mr. Lewis, he stated that it was up to Kim and Ed Jordan because they had to pay for it.  Later,

both told Plaintiff that she did not need the equipment to do her job.

ICCG concedes that Plaintiff suffered an adverse employment action under the ADA.  A

jury may also conclude that she was constructively discharged.  The same reasons discussed

above apply to Plaintiff's retaliation claim.

"To demonstrate a causal connection [in retaliation cases], a plaintiff generally must

show 'either (1) an unusually suggestive temporal proximity between the protected activity and

the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a

causal link.'"  *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007).  "In

the absence of that proof the plaintiff must show that from the 'evidence gleaned from the record

as a whole' the trier of the fact should infer causation."  *DeFlaminis*, 480 F.3d at 267 (quoting

*Farrell*, 206 F.3d at 281).  As discussed above, the timing here was unusually suggestive and

provides an inference of retaliatory animus.  *See Fasold v. Justice*, 409 F.3d 178, 190 (3d Cir.

2005).

Finally, Plaintiff has submitted sufficient evidence that would allow a reasonable

factfinder to conclude that ICCG's proffered reason for their change was merely pretext for

discrimination and retaliation over her request for accommodations, *supra*.  Accordingly,

summary judgment on Plaintiff's retaliation claim under the ADA will be denied.

**C.    PHRA Aiding and Abetting Claim**

In her Amended Complaint, Plaintiff asserts that Defendants Kim Jordan and Ed Jordan

aided and abetted ICCG's discrimination and retaliation in violation of Title VII, the ADA, and

the PHRA.  As discussed above, Plaintiff's underlying Title VII, ADA, and PHRA claims may

proceed to trial.  Defendants have not moved for summary judgment on Plaintiff's aiding and abetting claims against Kim Jordan and Ed Jordan under the PHRA.  Therefore, Plaintiff's PHRA aiding and abetting claims may proceed to trial, as well.

      **D.**     **Administrative Remedies**

Defendants assert that Plaintiff failed to exhaust her administrative remedies with regard to her ADA claim.  Defendants argue that Plaintiff is barred from amending her original charge because her claims for disability discrimination occurred prior to her original filing with the EEOC.  Defendants cite no case law in support of their position.

On May 30, 2018, Plaintiff filed her original charge of discrimination for sexual harassment and retaliation with the EEOC and the PHRC.  On August 7, 2018, Plaintiff amended her original charge to include her claims for disability discrimination and retaliation.  The EEOC issued Plaintiff her Right to Sue Letter on February 21, 2019 and she filed her first Complaint in this Court on May 21, 2019.  (ECF No. 1.)  Accordingly, Plaintiff has exhausted her administrative remedies.

**V.**     **CONCLUSION**

For these reasons, Defendants' Motion for Summary Judgment is denied.

An appropriate Order follows.

BY THE COURT:

*/s/ R. Barclay Surrick*
**R. BARCLAY SURRICK, J.**
